IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | | |
|---|---|---|
| GERALD D. LEACH, | ) | |
| | ) | |
| Plaintiff, | ) | CV 10-1128-PK |
| | ) | |
| v. | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| COMMISSIONER of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

PAPAK, Magistrate Judge:

Plaintiff Gerald Leach appeals the Commissioner's decision denying his application for disability insurance benefits under Title II of the Social Security Act. The court has jurisdiction under 42 U.S.C. § 405(g). The Commissioner's decision should be reversed and remanded under sentence four of 42 U.S.C. § 405(g) for the limited purposes outlined below.

1 - FINDINGS AND RECOMMENDATION

Leach alleged disability since December 31, 1993, due to depression and bipolar disorder. Admin. R. 15, 202. He satisfied the insured status requirements for a claim under Title II through March 31, 2008, and must establish that he was disabled on or before that date. 42 U.S.C. § 423(a)(1)(A); *Tidwell v. Apfel,* 161 F.3d 599, 601 (9th Cir. 1998). Leach filed his application on August 7, 2007. A claimant may be eligible for disability insurance benefits for up to twelve months preceding the filing date of his application. 20 C.F.R. § 404.621. Accordingly, the relevant period for Leach's claim is from August 2006 to March 2008.

The administrative law judge ("ALJ") applied the five-step sequential disability determination process described in 20 C.F.R. § 404.1520. *See Bowen v. Yuckert,* 482 U.S. 137, 140 (1987)(describing the decision-making process). As relevant to this appeal, the ALJ made the following findings. The ALJ found Leach's ability to perform basic work activities limited by generalized anxiety and depression. Admin. R. 17. She found that despite these impairments, Leach retained the residual functional capacity ("RFC") to perform work without exertional limitations, but was limited to work involving simple, repetitive tasks of no more than 3 steps, no more than occasional contact with coworkers and the general public, and no more than occasional changes in the work setting. *Id.* at 19. The ALJ elicited testimony from a vocational expert ("VE") who said a person having Leach's vocational factors and RFC could perform the requirements of occupations such as kitchen helper, warehouse worker, and hand packager, representing a significant number of jobs in the national economy. *Id.* at 22-23, 74-75. The ALJ concluded that Leach had failed to prove he was disabled within the meaning of the Social Security Act during the relevant time. *Id.* at 23.

## STANDARD OF REVIEW

The court reviews the Commissioner's decision to ensure that proper legal standards were applied and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). Under this standard, the court must uphold the Commissioner's findings of fact, provided they are supported by substantial evidence in the record as a whole, including inferences logically flowing from the evidence; the court must uphold such factual determinations, even if evidence exists to support another rational interpretation. *Tommasetti v. Astrue,* 553 F.3d 1035, 1040 (9th Cir. 2008); *Batson,* 359 F.3d at 1193; *Andrews v. Shalala,* 53 F.3d 1035, 1039-40 (9th Cir.1995); *Morgan v. Commissioner,* 169 F.3d 595, 599 (9th Cir. 1999).

## DISCUSSION

### I.   Claims of Error

Leach contends the ALJ's RFC assessment failed to accurately reflect all of his functional limitations because the ALJ improperly rejected a questionnaire signed by Sally Rothaker-Peyton, P.M.H.N.P., Kelly Goodman, L.C.S.W., and Richard Houle, M.D. He contends the ALJ improperly discounted the statement of his wife, Viktoria Leach. Leach contends the ALJ's RFC assessment was deficient because it did not account for the opinion of an agency reviewing psychologist, the testimony of the medical expert ("ME"), the side effects of his medications, or the ALJ's finding of moderate impairment in concentration, persistence or pace at step three of the decision-making process. Leach challenges the vocational testimony from the administrative hearing. Finally, Leach contends the ALJ's RFC assessment is undermined by the examination report of Keli Dean, Psy.D., which was first presented to the Appeals Council after the ALJ issued her decision.

## II.    <u>Mental Impairment Questionnaire</u>

Leach contends the ALJ improperly rejected a Mental Impairment Questionnaire completed by Sally Rothaker-Peyton, P.M.H.N.P., and Kelly Goodman, L.C.S.W., in December 2009.  Admin. R. 21, 540-47.  The ALJ's decision reflects that she considered the questionnaire in context with the record as a whole and discounted it in favor of the opinion of Gary Sacks, Ph.D., who examined Leach in April 2008.  Admin. R. 21.

The regulations define social workers and nurse practitioners as "other sources" and exclude them from the list of health care providers who are "acceptable medical sources."  20 C.F.R. § 404.1513 (a), (d).  Only acceptable medical sources can provide medical opinions.  20 C.F.R. § 404.1527(a)(2).  The opinions of other sources are evaluated as the statements of lay witnesses. *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223-24 (9th Cir. 2010).

Leach argues the questionnaire should be treated as the medical opinion of a treating physician because Richard Houle, M.D., cosigned it.  Leach argues Rothaker-Peyton and Goodman worked closely with Dr. Houle as an interdisciplinary team. *See Gomez v. Chater*, 73 F.3d 967, 971 (9th Cir. 1996)(the opinion of a nurse practitioner acting under the supervision and as the agent of a physician can properly be treated as part of the opinion of the physician).  The Commissioner contends *Gomez* is no longer controlling because an intervening change in the regulations makes it clear that participation in an interdisciplinary team does not transform "other sources" into "acceptable medical sources." Def.'s Br. 7.  The Commissioner's argument is reasonable and compelling, but contradicted by the Court of Appeals's reliance on *Gomez* in its recent published decision in *Taylor v. Comm'r Soc. Sec. Admin.*, 2011 WL 5084856, * 4 (9th Cir. Oct. 27, 2011). Regardless of the viability of *Gomez*, however, the record does not support a finding that Rothaker-

Peyton and Goodman worked under the supervision or acted as agents of Dr. Houle. There is no suggestion of such a relationship in the progress notes. Moreover, the questionnaire asked specifically whether they provided Leach's services as a treatment team with a doctoral level person in a supervisory or consultative role and they indicated they did not. Admin. R. 547. The presence of Dr. Houle's signature does not convert the questionnaire into the opinion of a treating physician because he did not complete the form and those who did complete it denied acting on his behalf. Accordingly the ALJ properly evaluated the questionnaire as the statement of "other sources."

The statements of other sources are evaluated as lay witness statements. *Turner*, 613 F.3d at 1223-24. An ALJ must consider the statements of lay witnesses who are in a position to observe a claimant's symptoms and daily activities. *Bruce v. Astrue,* 557 F.3d 1113, 1116 (9th Cir. 2009); *Stout v. Comm'r, Soc. Sec. Admin.,* 454 F.3d 1050, 1053 (9th Cir. 2006). To properly discount lay witness statements, the ALJ must give reasons that are supported by substantial evidence and germane to the witness. *Turner*, 613 F.3d at 1223-24. To determine whether substantial evidence supports the ALJ's reasoning, a reviewing court must consider the entire record as a whole, including inferences reasonably drawn from the evidence. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006); *Batson*, 359 F.3d at 1193.

The ALJ considered Rothaker-Peyton's and Goodman's responses on the questionnaire in context with all the evidence in the record and gave them little weight in her decision. The ALJ discounted the questionnaire in favor of Dr. Sacks's examination report because Rothaker-Peyton and Goodman were not acceptable medical sources as defined in the regulations, did not treat or observe Leach until after his insured status expired, and did not complete the questionnaire until 21

months after the expiration of his insured status. The ALJ gave significant weight to Dr. Sacks's report because she found it consistent with the evidence in the record as a whole. *Id.* at 21.

For the context in which the ALJ made this determination, it is useful to review Leach's treatment history. Leach alleged disability beginning in 1993, but the evidence in the record pertains primarily to the period from 2005 through 2009. In September 2005, Leach went to the emergency room after taking an overdose of Exedrin PM the previous day and stating he no longer wished to live. He admitted methamphetamine and marijuana abuse and had no history of psychiatric diagnosis or psychiatric hospital admissions. He was discharged in good condition with a diagnosis of major depression and polysubstance abuse. *Id.* at 383-85.

In February 2007, Leach had a similar episode in which he went to the emergency room after a nontoxic overdose of Tylenol PM, reporting depression and continued methamphetamine abuse. Leach had a negative medical work up. He was discharged in good condition without suicidal ideation. *Id.* at 395-96.

In September 2007, Leach was hospitalized with a substance induced mood disorder and amphetamine dependence. He appeared dysthymic, but all other findings in his psychiatric examination were normal. After an unremarkable hospital course, he was discharged in good condition. *Id.* at 379-82, 391-94, 401-03. In October 2007, Lee Walters, M.D., saw Leach to follow up this hospitalization for methamphetamine related depression. Dr. Walters made no abnormal objective findings, but indicated a new diagnosis of Bipolar Disorder and started a medication regimen of Depakote, Geodon, and Prozac. *Id.* at 368. In November 2007, Leach's mood was stable on this regimen and he was reportedly doing well except for problems sleeping. Dr. Walters started

a prescription of Trazadone to improve Leach's sleep. *Id.* at 366. This was the extent of Leach's treatment record when his insured status expired on March 31, 2008. *Id.* at 15.

Dr. Sacks performed his psychodiagnostic evaluation within a few days after Leach's insured status expired. Leach said his greatest impediment to employment was multiple suicide attempts. *Id.* at 427. As noted previously, to the extent they are reflected by medical records, each such episode was associated with methamphetamine abuse. Leach did not spontaneously report any symptom of posttraumatic stress disorder ("PTSD") or Bipolar Disorder. *Id.* at 430. Dr. Sacks's mental status examination was unremarkable, except Leach's intellect appeared to be below average. Leach did not demonstrate difficulty with attention. Dr. Sacks diagnosed substance induced psychosis in remission, and polysubstance abuse in reported remission. *Id.* He assessed Leach's global functioning at 60, indicating moderate symptoms. *Id.* at 431. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. Text Revision 2000) ("DSM-IV TR") (On the GAF scale, 60 marks the borderline between moderate symptoms in a person with moderate difficulty in broad functional areas and mild symptoms in a person who is generally functioning pretty well).

In June 2008, Leach saw Rothaker-Peyton for the first time, on a referral from a nonprofit social services agency for aid to the homeless. Leach gave a history including psychiatric hospitalizations "two or three times a year" beginning in September 2005. Admin. R. 455. This claim is not supported by the evidence. Rothaker-Peyton observed that Leach appeared anxious, but her mental status findings were otherwise unremarkable. She suggested a working diagnosis of PTSD, based on his subjective history of childhood abuse and witnessing his mother's suicide as an adult. *Id.* at 456. At this time, Kelly Goodman began assisting Leach to access social services and

to apply for social security disability benefits.  She provided Leach with information packets about PTSD.  *Id.* at 454-55.  In July and August 2008, Rothaker-Peyton made no abnormal clinical findings, except that Leach appeared anxious and tense.  Subjectively, Leach was worried about maintaining housing for himself and his pregnant wife.  An assay showed his medication level was inadequate and his Depakote dosage was adjusted accordingly.  *Id.* at 452-53, 508.

In November 2008, Leach continued to worry that he would lose housing.  He denied medication side effects.  Rothaker-Peyton observed that he was able to focus during appointments, but Leach told her he had difficulty with focus and concentration at other times.  *Id.* at 499, 501.  In June 2009, Rothaker-Peyton found Leach euthymic and made no abnormal findings;  Leach reported he was depressed "once in a while," and sometimes had paranoid thoughts and vigilant behaviors. *Id.* at 491-92.  Rothaker-Peyton did not see Leach again before she completed the Mental Impairment Questionnaire in December 2009.

Meanwhile, Leach saw his social worker Kelly Goodman in July, August, and September 2008, to discuss eligibility requirements for Temporary Assistance for Needy Families, temporary housing funded by a nonprofit organization, vocational rehabilitation opportunities, and disability lawyers to assist with his social security claim.  *Id.* at 504, 507.  Goodman observed that Leach was pleasant but a bit anxious.  In October 2008, Leach reported his one-year anniversary of being clean and sober since his hospital admission in September 2007 for methamphetamine induced mood disorder.  Leach told Goodman he had applied for a job picking up trash which he thought he could do because it did not require interaction with others.  *Id.* at 498, 500, 503.  In February 2009, Leach told Goodman his wife was due to give birth.  They discussed housing, welfare, and associated job search requirements.  Goodman wrote a letter for Leach requesting a waiver of such job search

requirements due to bipolar affective disorder and PTSD; she did not identify specific work-related activities Leach could not do. *Id.* at 495-96, 465, 467. Goodman did not see Leach again before she signed the Mental Impairment Questionnaire in December 2009.

Contemporaneously, beginning in July 2008, Leach received primary care from Richard Houle, M.D. Dr. Houle accepted Leach's existing diagnoses of bipolar disorder and substance dependence, dating from Dr. Walters's followup care after Leach's hospitalization for substance induced mood disorder in September 2007. *Id.* at 450. Dr. Houle provided Leach with Amitriptyline, which reportedly improved his sleep without hangover side effects. *Id.* at 450, 509, 510. Dr. Houle's only clinical observation was that Leach appeared well. *Id.* at 450. In the ensuing months, Dr. Houle treated Leach for insomnia, a spider bite, genital warts, a cigarette burn, and cellulitis. *Id.* at 505, 506, 509. In November 2008, he saw Leach for a Depakote prescription refill, noting that the medication continued to work well. *Id.* at 502. In March 2009, Leach saw Dr. Houle for medication management and reported he was sleeping well and had no new problems. *Id.* at 494. Dr. Houle saw Leach in April and June 2009, for smoking cessation and concerns about his testosterone level. *Id.* at 492-93. He did not see Leach again before the Mental Impairment Questionnaire was completed in December 2009.

In addition to this treatment history, the ALJ considered the Mental Impairment Questionnaire in context with her determination that Leach's subjective statements about the intensity, persistence, and limiting effects of his impairments were not credible. *Id.* at 20. The ALJ provided an adequate explanation supported by substantial evidence for her adverse credibility determination, and Leach does not challenge those findings in this appeal.

On the questionnaire, Rothaker-Peyton indicated diagnoses of bipolar affective disorder, PTSD, and combined drug dependence in sustained remission. She assessed Leach's current GAF at 65, indicating mild symptoms in a person who is generally functioning pretty well. DSM-IV TR 34. She rated his typical GAF for the preceding year at 60, indicating moderate symptoms. *Id.* She said Leach was responding to mood stabilizing medications and his prognosis was fair to good with medication compliance. Admin. R. 540, 542-43.

The questionnaire included a grid for estimating Leach's degree of limitation in 14 work-related activities. Based on the handwriting, it appears this portion of the questionnaire was completed by Goodman. The responses on this portion of the questionnaire suggested Leach would encounter marked work-related limitations that are starkly incongruent with Rothaker-Peyton's mild GAF assessment and prognosis. Goodman rated eight of the 14 abilities either markedly or extremely limited. *Id.* at 545. The inconsistency between these responses and Rothaker-Peyton's GAF assessment suggests a difference of opinion regarding the severity of Leach's work-related functional abilities. The grid indicated Leach would experience difficulty with stamina and fatigue and would need to work at a reduced pace if working full time. *Id.* at 543. It indicated Leach would be absent from work more than four times a month, but qualified this in a marginal notation suggesting it was attributable to unspecified trouble at home and not to his treatment or functional impairments. *Id.* at 544.

The limitations on the questionnaire are not reflected in the observations or clinical findings of the signers. As described previously, Rothaker-Peyton's progress notes indicate she observed Leach to be anxious and tense about housing, but describe no observations of difficulty with pace, fatigue, stamina, or attendance. Goodman's progress notes are focused on access to social services

10 - FINDINGS AND RECOMMENDATION

and likewise include no observed limitations in Leach's ability to function.  Dr. Houle provided

routine care and medication management and his notes do not include any observations that would

support the limitations on the questionnaire.

In this context, the ALJ discounted the questionnaire in favor of Dr. Sacks's evaluation

report.  The ALJ gave it less weight because Rothaker-Peyton and Goodman are not acceptable

medical sources.  *Id.* at 21.  The distinction between acceptable medical sources and other health care

providers who are not acceptable medical sources is significant.  The fact that a medical opinion is

from an "acceptable medical source" is a factor that may justify giving that opinion greater weight

than an opinion from a medical source who is not an "acceptable medical source" because the

Commissioner considers acceptable medical sources the most qualified health care professionals.

SSR 06-03p, 2006 WL 2329939 * 4.  This factor may be overcome if the other source's opinion

provides better supporting evidence or a better explanation than the opinion of the acceptable

medical source.  *Id.*  As already shown, however, the functional limitations on the questionnaire are

not supported by observations and their inconsistency with Rothaker-Peyton's GAF assessment

remains unexplained.  Under these circumstances it is reasonable to infer that the limitations are

premised primarily on Leach's subjective statements, which the ALJ found less than credible.

Accordingly, Leach has not shown that Rothaker-Peyton and Goodman had special information or

any other basis that would justify giving the questionnaire greater weight than the opinion of Dr.

Sacks.

The ALJ also correctly observed that Rothaker-Peyton, Goodman, and Dr. Houle did not treat

or observe Leach until after his insured status expired in March 2008.  Admin. R. 21.  The

questionnaire states that Leach was continuously unable to work beginning in approximately June

or July 2007. *Id.* 546. However, Rothaker-Peyton and Goodman did not even meet Leach for a full year after that time. They could not have observed Leach's symptoms, daily activities, or functional difficulties during the relevant time, and the opinion that he could not work during 2007 is wholly unsupported by any evidence other than Leach's subjective claims. It flows logically that the sources who completed the questionnaire did not have first hand information about Leach's functional capacity or ability to work during the relevant time. The ALJ was entitled to give greater weight to the evaluation of Dr. Sacks which was supported by clinical findings made at about the relevant time.

## III.    Lay Witness Statement

Viktoria Leach provided a written third party function report dated in February 2008. Notably, she indicated Leach had not been taking medications for a while when she gave her written statement. Admin. R. 234. Ms. Leach said Leach had nightmares and worried about being homeless. She said Leach needed someone to encourage him to do things, but he engaged in his hobbies of playing cards, hanging out with friends, and reading, as much as possible. She said when he became depressed he would isolate himself. He had a very short attention span and tended to get bored when following instructions. He could get along with authority figures pretty well, but would get upset if someone said or did something he thought was wrong. He tended to get frustrated with stress or changes in routine. *Id.* at 228-35.

Ms. Leach testified at the hearing in February 2010, that Leach had crying spells twice a month lasting for about 40 minutes. *Id.* at 60-61. He would get irritable or angry about twice a week for two hours. He sometimes would not comprehend what she said and sometimes would forget what he had read. *Id.* at 61. Ms. Leach described episodes she called flashbacks, in which Leach would seclude himself two or three times a week for a couple of hours. *Id.* at 62.

The ALJ found that Ms. Leach's statements were credible descriptions of what she had observed. *Id.* at 21. The ALJ did not believe that Leach accurately portrayed his limitations to his wife, however. That conclusion is consistent with and supported by the ALJ's uncontested credibility determination. *Id.* at 19, 21.

The RFC assessment reasonably addresses limitations in concentration, memory, social interactions, and dealing with changes in routine, by excluding Leach from all occupations except work involving simple, repetitive tasks of no more than 3 steps, no more than occasional contact with coworkers and the general public, and no more than occasional changes in the work setting. *Id.* at 19. Leach does not identify specific functional limitations in work-related activities established by his wife's statements that are not addressed in the RFC assessment. Accordingly, I find no error in the ALJ's evaluation of Ms. Leach's written statement or testimony.

## IV.    Reviewing Psychologist's Opinion

Leach contends the ALJ failed to consider and explain the weight she gave the medical opinions of agency reviewing experts Peter LeBray, Ph.D., and Kordell Kennemer, Psy.D. Dr. LeBray reviewed the entire case record and produced a Mental Residual Functional Capacity assessment form ("MRFC") dated May 1, 2008. He found the record supported moderate impairment in Leach's ability to work with detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the general public, adapt to changes in the work setting, be aware of normal hazards, and set realistic goals. He found no significant limitation in the remaining work-related abilities. Dr. LeBray elaborated on his summary conclusions in the narrative section of the MRFC. He said Leach could understand and remember simple instructions, tasks, and procedures and could carry out and persist at simpler, unrushed jobs

and routines with regular breaks and pace. He said Leach was capable of minimal contact with the public and other employees. Dr. LeBray added that Leach would fare best with a supportive supervisor who was predictable and not harsh with criticism, assigned nonhazardous tasks, and helped setting goals. Admin. R. 432-34. Dr. Kennemer affirmed Dr. LeBray's MRFC in November 2008. *Id.* at 464.

The ALJ discussed these findings and gave them significant weight in her decision. *Id.* at 21-22. The ALJ's RFC assessment reflects the accommodations Drs. LeBray and Kennemer indicated Leach required in order to work, but not the additional accommodations that would help him fare best. *Id.* at 19. Leach contends the ALJ erred by excluding the additional accommodations. The RFC is an assessment of the claimant's residual capacity to perform work activities in an ordinary work setting. SSR 96-8p, 1996 WL 374184, *2. It is not an assessment of the ideal conditions under which the claimant will do best, fare best, or otherwise excel. An ALJ is not required to discuss physicians' opinions that are recommendations or accommodations that are not imperative for the claimant to perform work. *See Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 691-92 (9th Cir. 2009)(physician's opinion that claimant "is less likely to have difficulty with" certain tasks is a recommendation and not a statement that claimant is only capable of the recommended tasks). Similarly, Dr. LeBray's statement that Leach would fare best in certain conditions is a recommendation and not a statement that Leach can only work in those recommended conditions. The failure to include those additional accommodations in the RFC was not error.

**V.    Medical Expert's Testimony**

Leach contends the ALJ erred by discounting testimony from Robert Davis, Ph.D., who appeared as the medical expert ("ME") at the administrative hearing. Dr. Davis opined that Leach

had marked impairment in concentration, persistence or pace, primarily concentration and attention. Admin. R. 71-72. The ALJ gave Dr. Davis's opinion some weight, but found the evidence of record did not support a finding that Leach had marked limitations in concentration, persistence or pace. *Id.* at 18.

A thorough review of the evidence in the record supports the ALJ's conclusion. In September 2007, Leach underwent mental status examinations during his hospitalization for substance induced mood disorder. He demonstrated normal attention span and concentration. *Id.* at 393. In April 2008, Dr. Sacks observed that Leach demonstrated no difficulty maintaining attention during his evaluation. *Id.* at 428. In May 2008, Dr. LeBray opined that the Leach had moderate impairment in the ability to maintain attention and concentration for extended periods. *Id.* at 432. In August and September 2009, Keli Dean, Psy.D., performed a comprehensive evaluation over two days and observed that Leach demonstrated good concentration and stamina throughout the evaluation. *Id.* at 565. She administered tests designed to measure his ability to maintain attention, and Leach scored in the average to high average range. *Id.* at 568, 570. This evidence supports the ALJ's conclusion that Leach did not have marked impairment in the ability to maintain concentration and attention.

## VI.   **Medication Side Effects**

Leach contends the ALJ failed to consider his alleged side effects from Depakote. In his testimony, Leach complained of a number of ailments, including lack of bowel and bladder control, restless leg syndrome, headaches and others. Admin. R. 42-45. The ALJ correctly found that these ailments were not reflected in Leach's complaints to treating sources or in their diagnostic findings. *Id.* at 17-18. The progress notes do not mention these conditions. As a consequence, the ALJ

properly found Leach had failed to prove they were medically determinable impairments resulting in persistent functional limitations. *Id.*

Notably, in his testimony, Leach did not associate these ailments with medications. The only medication side effect Leach identified in his testimony was weight gain which he associated with taking Depakote. *Id.* at 41. Weight gain is also the only persistent side effect reflected in the treatment records. In July 2008, Leach complained that after taking Trazadone as a sleep aid, he remained groggy in the morning. *Id.* at 452-53. He discontinued Trazadone, and started Amitriptyline, and said he had no hangover side effect with the new medication. *Id.* at 509. In November 2008, Leach reported he had gained some weight, but denied any other side effects with his regimen of Depakote, Geodon, and Amitriptyline. *Id.* at 499, 501. This remained true in June 2009. *Id.* at 491.

In summary, the evidence in the record provides no factual basis for Leach's argument that the ALJ erred in evaluating his medication side effects.

## VII.   Moderate Limitations in Concentration, Persistence, or Pace

Leach contends the ALJ's RFC assessment did not address her finding that he has moderate limitations in concentration, persistence, or pace. This argument conflates the broad categories of function used by the ALJ at step three of the decision-making process with the specific work-related abilities used to define the claimant's RFC.

At step three of the decision making process, an ALJ must determine whether the claimant's impairments are equivalent to "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. § 404.1520(d). The criteria for a the listed impairments are enumerated in 20 C.F.R. Part

404, Subpart P, Appendix 1. If the claimant can show that he satisfies the criteria for a listed impairment, he is presumed to be disabled without further inquiry, and an RFC assessment is not necessary. 20 C.F.R. § 404.1520a(d).

The criteria for mental impairments include so-called "B Criteria," which are four broad areas of function. One of the broad categories of function is the capacity to maintain concentration, persistence, or pace. To satisfy the criteria for a listed mental impairment the claimant must show marked impairment in at least two of the four broad categories of function. This is why an ALJ must estimate the severity of a claimant's deficiencies in the broad category maintaining concentration, persistence, or pace. *Id.* The purpose is to determine whether the listing criteria are met, not to identify specific work-related restrictions that comprise the RFC. The limitations identified in the broad B criteria categories are not part of the RFC assessment; they are used only in steps two and three of the decision-making process. SSR 96-8p, 1996 WL 374184, *4. The RFC assessment requires a more detailed assessment by itemizing various specific work-related functions which are the subject of the MRFC form, such as the one prepared by Dr. LeBray in this case.

At step three in this case, the ALJ determined that Leach did not satisfy the B criteria. Specifically, the ALJ found that Leach had no more than moderate difficulties in concentration, persistence, or pace, based on Leach's subjective statement that "he liked to read but struggled with comprehension and concentration." Admin. R. 18. Because Leach did not satisfy the criteria for a listed impairment, the ALJ properly continued the decision-making process to the next step and assessed Leach's RFC. In doing so, she properly relied on Dr. LeBray's MRFC and incorporated the limitations from that opinion into her RFC assessment. Therefore, the ALJ's assessment of Leach's residual mental functional capacity is supported by substantial evidence.

## V.       Vocational Evidence

At step five of the decision-making process, the Commissioner must show that jobs exist in the national economy that a person having the vocational factors and functional limitations of the claimant can perform. *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. § 404.1520(e), (f). The ALJ can satisfy this burden by eliciting the testimony of a VE with a hypothetical question that sets forth all the limitations of the claimant. *Andrews*, 53 F3d at 1043. Here, the ALJ elicited such testimony and the VE said a person having Leach's vocational factors and RFC could perform the requirements of occupations such as kitchen helper, warehouse worker, and hand packager, and that these occupations represent a significant number of jobs in the national economy. Admin. R. 22-23, 74-75.

Leach contends the ALJ improperly ignored documents he submitted to show that certain agencies of the federal and state governments do not compile data regarding the number of jobs in the national or regional economy broken down by the occupational code numbers used in the Dictionary of Occupational Titles. The documents show, for example, that the U.S. Department of Labor does not document how many jobs exist in the national economy in the occupation of kitchen helper. Leach does not contend these documents show numbers contradicting the VE's testimony.

An ALJ may properly rely on a VE's testimony as to the number of jobs in the national economy. A VE's expertise provides the necessary foundation for such testimony. *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). The ALJ did not err by relying on the VE's testimony.

\\\

\\\

18 - FINDINGS AND RECOMMENDATION

## VI.    **Opinion of Dr. Dean**

Dr. Dean evaluated Leach in August and September 2009, 18 months after the end of the period that is relevant for his claim. Admin. R. 561. She evaluated Leach for the purpose of assessing his level of intellectual and achievement functioning, strengths and weaknesses, and capacity to learn new skills and retain information. Admin. R. 561. The assessment was based on a clinical interview, review of records from the relevant period, and administration of a battery of tests. In her mental status evaluation, Dr. Dean made no abnormal findings, but observed that Leach appeared to be anxious. Leach gave good effort on testing and demonstrated good concentration and stamina throughout the evaluation. *Id.* at 565.

On intelligence testing, Leach performed in the borderline range. *Id.* at 567. Leach scored in the average to high average range on measures of his ability to sustain attention. His scores on executive functioning were normal. He produced a valid personality profile reflecting a person who is shy or apprehensive in social situations and experiences significant distress in the form of anxiety. *Id.* at 568-69.

Dr. Dean gave Leach a diagnosis of PTSD, Major Depression, methamphetamine dependence in sustained remission, cannabis dependence in remission, and personality disorder with borderline, avoidant, and dependent features. She gave him a GAF assessment of 50, denoting serious symptoms or serious impairment in social, occupational, or school functioning. DSM-IV TR 34. Admin. R. 569.

Dr. Dean's report included an MRFC worksheet on which she found Leach markedly impaired in the ability to work with detailed instructions, maintain a regular work schedule, pace,

and attendance, work in proximity to others, and accept instructions and criticism from supervisors. *Id.* at 576.

Although it was completed in September 2009, Dr. Dean's evaluation was not presented to the Social Security Administration before the ALJ issued her written decision in March 2010. *Id.* at 12, 29. Dr. Dean's report was presented to the Appeals Council in July 2010 in support of a request to redetermine Leach's claim. *Id.* at 560. The Appeals Council considered Dr. Dean's report and made it part of the administrative record, but found it provided no basis to review the ALJ's decision. *Id.* at 2, 5.

The Commissioner contends Dr. Dean's report cannot support a reversal unless Leach shows it is new and material and that there was good cause for Leach's failure to present the evidence in a timely fashion. The Commissioner relies on the language of 42 U.S.C. § 405(g), *Mayes v. Massanari*, 276 F.3d 453, 462-63 (9th Cir. 2001), and *Orteza v. Shalala*, 50 F.3d 748, 751 (9th Cir. 1995). These authorities refer to the good cause requirement in sentence six of section 405(g), which pertains when a claimant seeks review from the federal court based on new evidence which was not part of the administrative record. Here, Dr. Dean's report was made part of the administrative record and considered by the Appeals Council. Admin. R. 2, 5. The good cause requirement in sentence six of section 405(g) does not apply because Leach does not seek a remand to permit the Commissioner to consider evidence that was not before him. Instead, Leach contends the evidence was before the Commissioner, but was not evaluated properly.

Under these circumstances, the court considers on appeal both the ALJ's decision and the additional material before the Appeals Council in its determination whether the Commissioner's final decision is supported by substantial evidence. *Harman v. Apfel*, 211 F.3d 1172, 1179-80 (9th

Cir. 2001); *Ramirez v. Shalala*, 8 F.3d 1449, 1452 (9th Cir. 1993).  Where a claimant seeks review from the Appeals Council based on evidence not presented to the ALJ, the Appeals Council must provide such review if the submitted evidence is new, material, and relates to the period on or before the date of the ALJ's decision.  *Ramirez*, 8 F.3d at 1452; 20 C.F.R. § 404.970(b).

The Commissioner apparently concedes that Dr. Dean's evaluation is new evidence, but contends it is not material and does not relate to Leach's condition during the relevant period of time. Evidence is material only if there is a reasonable possibility that the new evidence would have changed the outcome of the ALJ's decision if it had been before the ALJ at the time the decision was made.  *Booz v. Sec'y of Health & Human Servs.*, 734 F.2d 1378, 1380-81 (9th Cir. 1984).

I am satisfied that there is a reasonable possibility that Dr. Dean's findings would have changed the outcome of the disability determination.  The ALJ's RFC assessment did not include limitations that would accommodate the marked deficiencies Dr. Dean found in Leach's ability to maintain a regular work schedule, pace, and attendance and accept instructions and criticism from supervisors.  *Id.* at 576.  If the ALJ had determined that Dr. Dean's evaluation was consistent with the record as a whole and had elicited testimony from the VE with assumptions based on her findings, the outcome of the determination might have been different.  At this juncture, it is unclear whether the ALJ would have accepted the findings in Dr. Dean's evaluation, or would have provided a legally sufficient explanation to discount it.  I acknowledge that Dr. Dean's evaluation came 18 months after Leach's insured status expired.  Nonetheless, her findings could relate to Leach's earlier condition if they are based on long term impairments which persisted since before his insured status expired.  These matters must be resolved at the administrative level.

## RECOMMENDATION

Based on the foregoing findings and conclusions, the Commissioner's final decision should be reversed and remanded for further proceedings to evaluate Dr. Dean's report in context with the record as a whole. A final judgment should be entered pursuant to sentence four of 42 U.S.C. § 405(g).

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

DATED this 8thday of November, 2011.

Paul Papak
United States Magistrate Judge